UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION

Plaintiff,

v.

Civil Action No.

JACOB "KOBI" ALEXANDER,
DAVID KREINBERG, and
WILLIAM F. SORIN,

Defendants.

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Plaintiff" or "Commission")
alleges for its Complaint, as follows:

## SUMMARY

1.     This case concerns a fraudulent scheme by the two former top executive officers
and the former General Counsel of Comverse Technology, Inc. ("CTI" or the "Company") to
grant undisclosed, in-the-money options to themselves and others, by backdating stock option
grants from 1991 through 2001 to coincide with historically low closing prices for the
Company's stock.  By engaging in this scheme, these executives were able to conceal from
investors that the Company was not recording material compensation expenses and was
materially overstating CTI's net income and earnings per share.  These executives collectively
realized millions of dollars in illicit compensation through the exercise of illegally backdated
option grants and subsequent sale of CTI stock.

2.     The scheme was orchestrated starting no later than 1991 by Jacob "Kobi"
Alexander ("Alexander"), CTI's former Chairman and Chief Executive Officer, and William F.

Sorin, Esq. ("Sorin"), CTI's former General Counsel and, later, Senior General Counsel, who also served as a Director and as CTI's Corporate Secretary.  David Kreinberg ("Kreinberg"), CTI's former Chief Financial Officer, joined the scheme no later than 1998.

3.     Defendants Alexander and Kreinberg looked back and picked a grant date that coincided with dates of historically low annual and quarterly closing prices for CTI's common stock.  Alexander and Kreinberg used the closing price of CTI's common stock on that day as the exercise price for all options to be awarded under that grant.  Defendant Sorin, with Alexander and Kreinberg's knowledge, then created company records that falsely indicated that CTI's Remuneration and Stock Option Committee (the "Compensation Committee") had actually acted on that date to make the grant.  In reality, no corporate action took place on the backdated date selected by the defendants.

4.     Beginning in 1999, Alexander and Kreinberg expanded the scheme.  From 1999 through at least April 2002, they created a slush fund of backdated options which Alexander, with Kreinberg's knowledge, used to recruit and retain key personnel.  Alexander and Kreinberg created the slush fund by, among other means, inserting the names of fictitious employees among the names of real employees on the grant list for option awards.  They proposed option awards small enough so as not to draw the attention of CTI's Compensation Committee at the time the Compensation Committee approved the option grant.  Also, on at least one occasion, Kreinberg altered the list of grantees submitted to the Compensation Committee by removing line items identifying the slush fund, but leaving the options to be added to the slush fund in the overall grant list's total.

5.     The defendants' fraudulent misconduct caused CTI from fiscal year 1991 to fiscal year 2005 (i) to file materially false and misleading financial statements that materially

2

understated its compensation expenses and materially overstated its quarterly and annual net income and earnings per share and (ii) to make disclosures in its periodic filings and proxy statements that falsely portrayed CTI's options as having been granted at exercise prices equal to the fair market value of CTI's common stock on the date of the grant. Defendants also misled CTI's outside auditors in an attempt to hide their scheme.

6.     Beginning in 2000, Kreinberg, with Sorin's knowledge, initiated a similar backdating scheme at Ulticom, Inc. ("Ulticom"), a publicly-traded company whose stock was majority owned by CTI. Kreinberg instructed Ulticom personnel to select a grant date with the benefit of hindsight based on dates of low closing prices for Ulticom stock. As with CTI, Kreinberg and Sorin's undisclosed backdating scheme caused Ulticom to materially false and misleading financial statements, and to make materially false and misleading disclosures regarding option grants, in its filings with the Commission.

7.     Alexander, Kreinberg and Sorin benefited tremendously from their scheme. To date, Alexander has realized a gain of nearly $138 million from sales of stock underlying the exercises of backdated options that were granted during the 1991 to 2001 period. At least $6.4 million of the $138 million gain represents the in-the-money portion at the time of the grant. Kreinberg has realized a gain of nearly $13 million from sales of stock underlying the exercises of backdated options that were granted during the 1994 to 2001 period. At least $1 million of the $13 million gain represents the in-the-money portion at the time of the grant. Sorin has realized more than $14 million from the sale of stock underlying the exercises of backdated options that were granted during the 1991 to 2001 period. Approximately $1 million of the $14 million gain represents the in-the-money portion at time of the grant. The defendants collectively continue to

hold millions of backdated options. The millions of dollars of realized and unrealized gains generated on these options are ill-gotten gains.

8.     CTI and Ulticom have announced that they each expect to restate historical financial results for multiple years in order to record additional material non-cash charges for option-related compensation expenses. Additionally, Verint Systems, Inc. ("Verint"), another wholly-owned subsidiary of CTI prior to going public in 2002, has announced that it also may need to record non-cash charges for stock-based compensation because of certain CTI stock options that CTI issued to Verint managers and employees while Verint was still a wholly-owned subsidiary of CTI.

9.     By engaging in such conduct, Alexander, Kreinberg and Sorin violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), 14(a) and 16(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) and 78p(a)] and Exchange Act Rules 10b-5, 13b2-1, 13b2-2, 14a-9 and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2, 240.14a-9 and 240.16a-3] thereunder. In addition, Alexander and Kreinberg violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]. Through their conduct, each defendant aided and abetted CTI's violations of Exchange Act Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]. In addition, Kreinberg and Sorin aided and abetted Ulticom's violations of Exchange Act Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20and 240.13a-1], and Kreinberg aided and abetted Ulticom's violations of Exchange Act Rule 13a-13 [17 C.F.R. § 240.13a-13].

10.     Unless enjoined, Alexander, Kreinberg and Sorin are likely to commit such violations in the future.  They should be enjoined from doing so, ordered to disgorge any ill-gotten gains or benefits derived as a result of their violations (whether realized, unrealized or received) and prejudgment interest thereon, and ordered to pay appropriate civil money penalties. In addition, the defendants should be prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)].

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

12.     The defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, transactions, practices and courses of business alleged herein.  Venue is proper in this District because CTI was headquartered and/or maintained an office in Woodbury, New York at all relevant times and certain of the acts, transactions, practices and courses of business alleged herein took place in the Eastern District of New York.

## THE DEFENDANTS

13.     **Defendant Jacob "Kobi" Alexander**, 54, a resident of New York, New York, co-founded CTI in October 1984.  Alexander served as the Chairman of the Board ("Chairman") and Chief Executive Officer ("CEO") of CTI from 1987 to May 1, 2006, when he resigned during an investigation being conducted by a Special Committee of CTI's Board of Directors into the timing of CTI's option grants.  Additionally, Alexander was Chairman of Ulticom from

5

October 1997 until his resignation on May 1, 2006, and he was a member of Ulticom's Compensation Committee for roughly the past six years. He was Chairman and a member of the Compensation Committee of other CTI subsidiaries, including Verint. Alexander holds a Bachelor's degree in Economics from Hebrew University of Jerusalem and a Master's degree in Finance from New York University. He reviewed and signed each of CTI's annual reports on Form 10-K and quarterly reports on Form 10-Q since at least 1991. He also reviewed and approved each proxy statement CTI filed during the relevant period.

14.    **Defendant David Kreinberg**, 41, a resident of Teaneck, New Jersey, is a certified public accountant with a lapsed license. Kreinberg was a senior manager at Deloitte & Touche LLP ("D&T") until April 1994, when he became Vice President of Financial Planning at CTI. He served as Vice President of Finance and Treasurer at CTI from 1996 until May 1999 and, in May 1999, he was officially appointed CTI's Chief Financial Officer ("CFO"). Kreinberg had performed many of the duties of a CFO for years prior to May 1999. He resigned his position as CFO on May 1, 2006 during the Special Committee's investigation. Kreinberg also served as Ulticom's CFO from December 1999 to September 2001, and was a Director of Ulticom between April 2000 and May 1, 2006. Additionally, he served on the Compensation Committee of Verint. Kreinberg received a Bachelor's degree in Accounting from Yeshiva University and an M.B.A. in Finance and International Business from Columbia University. Kreinberg reviewed and signed each of CTI's annual reports on Form 10-K since April 2000, and quarterly reports on Form 10-Q since June 1999. He assisted in the preparation of CTI's annual and quarterly reports beginning in 1994. He also reviewed, approved and helped to prepare each proxy statement CTI filed since at least 1999.

6

15.     **Defendant William F. Sorin**, 56, a resident of New York, New York, is an attorney who served as General Counsel ("GC") and then Senior GC of CTI from October 1984 until his resignation on May 1, 2006 during the Special Committee's investigation.  He also was Corporate Secretary and a Director of CTI during this time.  Additionally, Sorin was a Director of Ulticom and served on Ulticom's Compensation Committee from 2000 to June 2004.  Sorin received his law degree from Harvard Law School.  Sorin reviewed and signed each of CTI's annual reports on Form 10-K since at least 1991 and he reviewed each of CTI's quarterly reports on Form 10-Q.  He drafted and reviewed all CTI proxy statements and stock option plans during the relevant period.

### CTI AND ITS SUBSIDIARIES

16.     **Converse Technology, Inc.** is a New York corporation that makes software, systems and related services for multimedia communication and information processing applications.  The Company was headquartered in Woodbury, New York, throughout most of the relevant period and currently maintains office space and/or operations facilities in Manhattan and Long Island, New York; Wakefield, Massachusetts; Tel Aviv, Israel and various other locations within the United States, Europe, Asia, South America, Africa and Canada.  CTI's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and trades on the NASDAQ National Market System under the symbol "CMVT."  CTI's fiscal year ends on January 31.  Prior to 1998, CTI's fiscal year ended on December 31.  CTI's common stock has been a component of the Standard and Poor's 500 and the NASDAQ 100 indices since 1999.

17.     **Ulticom, Inc.** is a New Jersey corporation based in Mount Laurel, New Jersey, that provides service enabling signaling software for fixed, mobile and Internet communications.

Ulticom's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and trades on the NASDAQ National Market System under the symbol "ULCM." Prior to going public in 2000, Ulticom was a wholly-owned subsidiary of CTI. Ulticom is currently a majority-owned subsidiary of CTI. Ulticom's fiscal year ends on January 31.

## FACTS

18.     In the 1990s and early 2000s, CTI experienced substantial growth in both revenues and in the size of its worldwide operations. To recruit and retain key employees, CTI made liberal use of employee stock options as a form of compensation. Each option gave the grantee the right to buy one share of CTI common stock from the Company at a set price, called the "exercise" or "strike" price, on a future date after the option vested. The option was "in-the-money" whenever the trading price of CTI's common stock exceeded the option's exercise price. The option was "at-the-money" whenever the trading price of CTI's common stock and the exercise price were the same. The option was "underwater" or "out-of-the-money" whenever the trading price of CTI's common stock was less than the exercise price. Throughout the relevant period, CTI represented that its option grants were made at fair market value, i.e., the closing trading price of CTI common stock on the date of grant.

### A.     The CTI Stock Option Plans

19.     From 1991 through 2002, CTI granted stock options to its employees and employee-directors (such as Alexander, Kreinberg and Sorin) and those of its various subsidiaries and affiliates, like Ulticom and Verint, pursuant to at least eight different stock option plans. The plans had been drafted by Sorin, approved by the Board of Directors and voted upon and adopted by CTI's shareholders.

20.     Options were granted on a company-wide basis under the following plans:

| Plan | Effective From/To | Stock Available Under The Plan |
|---|---|---|
| 1987 Stock Option Plan (As Amended) | 1993 – 10/8/97 | 33,000,000 shs. |
| 1994 Stock Option Plan | 9/16/94 – 9/15/04 | 950,000 shs. |
| 1995 Stock Option Plan | 10/13/95-10/12/05 | 1,000,000 shs. |
| 1996 Stock Option Plan | 10/31/96-10/31/06 | 1,000,000 shs. |
| 1997 Stock Incentive Compensation Plan | 11/21/97-11/20/07 | 2,500,000 shs. |
| 1999 Stock Incentive Compensation Plan | 5/13/99-5/12/09 | 3,500,000 shs. |
| 2000 Stock Incentive Compensation Plan | 9/15/00-9/14/10 | 9,000,000 shs. |
| 2001 Stock Incentive Compensation Plan | 6/15/01-6/15/11 | 9,700,000 shs. |

21.     The basic terms of the plans were unchanged during the relevant period.

22.     The stated purpose of each plan was to attract and retain employees and directors at CTI and its subsidiaries by giving those persons "a greater stake in the Company's success and a closer identity with it."

23.     Each plan gave CTI's Compensation Committee, which typically had three members during the relevant time period, full power to interpret and administer the plans and full authority (i) to select the specific employees to whom awards would be granted under the plans and (ii) to determine the type and amount of the award to be granted such employees, and the terms of the option agreements to be entered into with such employees.

24.     Options granted to CTI employees, including Alexander, Kreinberg and Sorin, could be structured as either "incentive options" (defined by Section 422 of the Internal Revenue Code) or "non-qualified options" (defined as any option that is not an incentive option), each with different tax implications for the grantee and the Company.  Non-employee-directors and employees of CTI's affiliates could receive only non-qualified options.

25.     Under the plans, the Compensation Committee was responsible for determining the exercise price of each option grant, within certain limitations.  Incentive stock options could

9

not have an exercise price less than the fair market value of a share of CTI common stock "on the date of grant." The plans gave the Compensation Committee greater latitude in determining the exercise price of non-qualified options and options granted to foreign nationals and others employed outside the United States. Nevertheless, the Compensation Committee intended to grant all stock options that are the subject of this Complaint at fair market value – irrespective of whether the options were incentive or non-qualified.

26.     The plans, with one exception, defined fair market value to be the closing sale price of a share of CTI common stock on the date of grant as published by the principal national securities exchange on which CTI's common stock was listed.

27.     If a grant recipient's employment with the Company, or any subsidiary or affiliate, terminated for reasons other than death, disability, or retirement, all unexercised options were terminated on the earlier of 90 days from the date of termination or on the date specified in the employee's option agreement. Different periods applied if the termination resulted from death, disability or retirement. If an option went unexercised due to termination, then the shares underlying the option reverted to the pool of options available for future awards under the plan. Options that reverted to the pool, however, options could not be awarded to others without Compensation Committee approval.

28.     The plans provided that any shares authorized under the plans and any outstanding awards under the plans were to be adjusted in the event of a stock split or other distribution of shares to stockholders or corporate change affecting the Company's common stock.

**B.**     **The CTI Bylaws**

29.     The bylaws of CTI that were in effect from 1987 until March 2003, empowered CTI's Compensation Committee to act formally on option grant proposals in two ways.  The Compensation Committee could act without a formal meeting if all members of the Committee consented in writing to the adoption of a resolution authorizing the action (otherwise known as a "unanimous written consent"); or, the Compensation Committee could act by holding a meeting at which a quorum of Committee members is present, if a majority of those present at the meeting approve the action.  Under the bylaws, a Committee member is deemed present at a meeting only if he appears in person at the meeting or participates telephonically and all participants in the meeting are able to hear each other at the same time.

30.     To the extent the Compensation Committee acted on stock option grant proposals through unanimous written consents, the bylaws provided that the signature of all Compensation Committee members was needed for the consents to make a grant effective.

31.     To the extent the Compensation Committee acted on stock option grant proposals through a formal meeting, the bylaws required that at least two members of the Committee were required to be present at the meeting and to approve the grant.  Under the bylaws, telephonic conferences with Committee members, with participation by less than a quorum, would not satisfy the requirements of a formal meeting.

32.     For the vast majority of option grants CTI made during the period 1991 through 2001, the Compensation Committee acted through unanimous written consents, not through a formal meeting of Compensation Committee members.

**C.**     **Accounting For Options Under**
           **Generally Accepted Accounting Principles ("GAAP")**

33.     Throughout the relevant time period, CTI and Ulticom accounted for stock options using the intrinsic method described in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"). Under APB 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." The measurement date, as defined by APB 25, is the first date on which the following information is known: (i) the number of options that an individual employee is entitled to receive and (ii) the exercise price. An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed. Excluding non-employee directors, APB 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

**D.**     **The Option Granting Process At CTI**

34.     Alexander directed and controlled the option grant process and initiated the backdating scheme. Starting no later than 1998, Kreinberg assisted Alexander in the scheme by, among other things, selecting the backdated grant dates. Sorin, at all relevant times, interfaced with the CTI Compensation Committee and played a critical role in the scheme by drafting grant documents with false grant dates and obtaining the Committee's approval of the Company's grants.

35.     Prior to fiscal year 1998, which ended January 31, 1998, CTI granted stock options at various times of the year, whenever Alexander decided to do so. The practice changed

in fiscal year 1998, when, among other things, the Compensation Committee chairman suggested the Company award grants at the same time each year. Accordingly, beginning with fiscal year 1998, company-wide grants were made only during the latter part of the fiscal year. Grants made to smaller groups of employees to accommodate specific situations, referred to as "one-off grants," were still made throughout the year.

36. The process for granting options at CTI was similar in all relevant years.

37. When Alexander decided he wanted to initiate a grant, he determined the approximate number of shares to be awarded in that grant and then allotted shares between each of CTI's operating divisions and subsidiaries.

38. Alexander subsequently informed the heads of CTI's divisions and subsidiaries that a grant was in the works and he told them the share allotment for their groups. They were not told of a proposed grant date or price. Supervisors, in turn, created proposed grant lists which contained the name of each employee to whom they proposed granting stock options and the amount of options they proposed to give each such employee. These lists eventually were forwarded to an employee assisting Alexander (the "Assistant"). For more senior CTI executives, including himself, Alexander decided how many shares each would receive. The Assistant then consolidated the separate lists of proposed grantees into a master list. Sorin maintained the master list on a spreadsheet prior to 1996.

39. At some point in the grant process, Alexander "cherry-picked" the grant date. He looked back at CTI's historical stock prices and, with the benefit of hindsight, chose a grant date that corresponded to a date on which CTI's common stock was trading at a relative low. Kreinberg joined Alexander in selecting these dates starting no later than 1998.

13

40. Sorin ultimately obtained the master list of proposed grantees and sought to have the grant approved by the Compensation Committee. The master list, at that point, also included a proposed grant date and exercise price that Alexander (and, starting in 1998, Kreinberg), with Sorin's knowledge, had selected with the benefit of hindsight.

41. Sorin, or the Assistant acting at the request of Sorin and using Sorin's template, subsequently drafted unanimous written consent forms pertaining to the proposed grant and sent such forms to the Compensation Committee members for signature. Sorin, or the Assistant at Alexander's direction, inserted into the draft consent forms an "as of" date that falsely indicated for each grant that corporate action sufficient to approve the grant had taken place on the "as of" date. As Alexander, Kreinberg and Sorin knew, the "as of" date in the unanimous written consents was actually the look-back date that Alexander or Kreinberg had given to Sorin or the Assistant. Sorin or the Assistant also generally included in the Compensation Committee's option approval packet the master list, or at least a portion thereof, containing proposed grantee names and award amounts. Sorin occasionally would place separate telephone calls to one or more members of the Compensation Committee to inform them of the total number of options in the grant and to let them know that the approval packet was on its way. Compensation Committee members were generally not aware of an impending grant prior to receiving Sorin's telephone call or receiving the above-described packet.

42. Upon receiving their packet of materials from Sorin or from the Assistant, members of the Compensation Committee reviewed the grant lists, paying particular attention to the total number of shares to be awarded and the specific number of shares to be granted to CTI's executives. The Committee members signed, but did not date, their individual copies of the consents and returned them to the Assistant. Original consents were then forwarded to Sorin.

14

43.     Based on their involvement in the option grant process, each of the defendants knew, or was reckless in not knowing, that the unanimous written consents were false because the "as of" dates that were inserted into the consents and reflected in CTI's books and records did not represent the true grant dates.  Alexander, Kreinberg and Sorin knew that no corporate action to approve the option grants had actually occurred on the "as of" date, or at any other time prior to the time the Compensation Committee members signed the unanimous written consents. Alexander and Kreinberg knew this because they were the ones who had picked the grant date by looking back, with the benefit of hindsight, at CTI's historical trading prices and selecting a date with a low trading price.  Sorin did not receive the "as of" date from Alexander until after that date had passed.  As the liaison to the Compensation Committee on option grants, Sorin knew, or was reckless in not knowing, that no corporate action had taken place on the "as of" date because, among other things, the Committee had not approved the grant on the "as of" date. Indeed, the Committee had not even received (much less signed) the unanimous written consents on that date.

44.     Options approved by the Compensation Committee during the period 1991 to 2001 generally vested ratably over a three or four year period.  An option with a backdated grant date, in essence, had an accelerated vesting schedule because the Company used the backdated date for vesting purposes, not the date of actual Compensation Committee approval.

45.     After receiving signed consents from all members of CTI's Compensation Committee, the Assistant typically began to enter the details of each employee's grant into Equity Edge — the electronic system that CTI used to track option grants, exercises and other information relevant to stock options.

46.     The master list sent to the Compensation Committee for approval served as the basis for the Assistant's entries into Equity Edge. However, information on the master list frequently changed after the Committee had officially acted on the grant proposal. It was common, for example, for CTI to amend the list to take grants from employees who were leaving or had left the Company and to give increased awards to employees or give awards to employees who had not previously been identified for an option award. It also was common for supervisors to change their minds about the size of an award to a particular employee and thus to increase or reduce grants to that employee by transferring grants among recipients on the master list. Contrary to CTI's plans, these changes were not brought to the Compensation Committee's attention and the Committee was not asked to approve these changes. Alexander or Kreinberg, with Sorin's knowledge, instructed the Assistant to make the changes described above and enter them into Equity Edge.

47.     Once all the information was entered into Equity Edge, option agreements were subsequently sent to persons reflected as grant recipients in Equity Edge. Further, the Company used Equity Edge reports to calculate, among other things, the Company's earnings per share ("EPS") and as a source of information for options-related disclosures its Forms 10-K, 10-Q and proxy statements.

48.     Overall, between 1991 and 2001, there were at least 26 backdated option grants at CTI. Backdated in-the-money options were granted during at that period to CTI employees and employee-directors, like Alexander, Kreinberg and Sorin. Such options also were granted to employees of Ulticom and Verint, until these entities became separate, publicly-traded companies, and to employees of other CTI subsidiaries.

49.     Six out of seven company-wide grants made by CTI during the relevant period were granted at or near the lowest price for the fiscal quarter or year.  In an article dated March 18, 2006, The Wall Street Journal analyzed the pattern of stock option grants made to defendant Alexander between roughly 1995 and 2002 and reported that the odds were one in six billion that such grants would have fallen on dates just ahead of sharp gains in CTI's stock price by chance.

50.     The secret backdating scheme, among other things, allowed the defendants (i) to disguise the fact that the Company was paying higher compensation to executives and employees by awarding them in-the-money options and (ii) to avoid having to expense the in-the-money portion as a compensation expense and thus avoid reductions to the Company's net income and EPS.  Keeping the scheme secret also hid the injury to the Company and shareholders which occurred when executives and employees exercised the options and made capital contributions to CTI that were less than they should have paid, had the options not been granted in-the-money. Finally, Alexander, Kreinberg and Sorin knew that, during the relevant time alleged herein, certain institutional investors were opposed to stock option plans that allowed grants of options at below the fair market value of the underlying stock at the time of the grant.

51.     The scheme also conferred on the defendants great personal financial benefits. Specifically, from 1991 through 2001, Alexander was awarded at least 8,625,000 options (multiples more than any other employee of CTI), Kreinberg was awarded at least 344,777 options and Sorin was awarded 434,500 options, all of which had been backdated and carried an exercise price below fair market value at the time of the grant.  Overall, Alexander received more options than any other Comverse employee and Kreinberg and Sorin ranked in the top ten employee option recipients.  As set forth in Paragraph 7, the Defendants, to date, have made

millions of dollars on their exercises of options and sales of the underlying shares. Defendants collectively continue to hold millions of backdated options.

52.     In addition to stock options, Alexander and Kreinberg received salary, bonus, restricted stock, and other compensation from CTI during the relevant period. Alexander's bonus typically amounted to a percentage of CTI's earnings each year. By contrast, Sorin, in addition to receiving options, billed CTI for legal services rendered during the relevant period. CTI was Sorin's most significant client, occupying a majority of his billable time.

53.     The numbers reflected in Paragraph 51 are pre-split numbers. CTI's stock split 1:10 on March 1, 1993, 3:2 on April 16, 1999 and 2:1 on April 4, 2000. Accordingly, today, the number of options held by Alexander, Kreinberg and Sorin from earlier grants are considerably higher than the numbers reflected in the actual grant approval documents.

### 1.     CTI's Backdated Company-Wide Option Grants

54.     CTI granted stock options on a company-wide level a total of seven times between fiscal years 1991 and 2001. Each of these grants was backdated to a date on which no corporate action was taken to approve the grant.

55.     Stock options were purportedly granted on a company-wide basis as of July 15, 1996. A total of 459,027 options with an exercise price of $23.75 per share were awarded to 112 grantees. Alexander selected the July 15 date and price by looking back at CTI's trading history -- July 15 had the second-lowest closing price for the fiscal quarter. The Compensation Committee's approval for this grant was not sought or obtained on July 15, the date Alexander selected with hindsight, or at any time before the unanimous written consents were sent and signed. Although the Compensation Committee members' unanimous written consents making this grant do not indicate the date on which they were signed, they likely were signed on or

shortly before September 10, 1996, when the Assistant began to enter grant information into Equity Edge. CTI's common stock had risen to $36.50 per share by September 10, 1996. The intrinsic value of each option had increased by $12.75 per option, or nearly $6 million overall across all recipients, by September 10, 1996. Alexander, Kreinberg and Sorin were granted 100,000 options, 17,777 options and 10,000 options, respectively, which were in-the-money on September 10 by approximately $1,275,000 (Alexander), $226,657. (Kreinberg) and $127,500 (Sorin). The backdating shortened the vesting period of these options by nearly two months.

56.    Stock options also were purportedly granted on a company-wide basis as of May 28, 1997. A total of 711,000 options with an exercise price of $44.25 per share were awarded to 99 grantees. Alexander selected the May 28 date and price by looking back at CTI's trading history. The May 28 closing price was a relative low for the fiscal quarter. The Compensation Committee's approval for this grant was not sought or obtained on May 28, the date Alexander selected with hindsight, or at any time before the unanimous written consents were sent and signed. Although the Compensation Committee members' unanimous written consents making this grant do not indicate the precise date on which they were signed, they could not have been signed prior to June 16, 1997, nearly three weeks after May 28, when Sorin sent the consents to the Compensation Committee for signature. CTI's stock price closed at $45.75 per share on June 16, 1997. Between May 28, 1997 and June 16, 1997, the intrinsic value of each option had increased by at least $1.50 per option, or more than $1 million across all recipients. Alexander, Kreinberg and Sorin had been granted 150,000 options, 5,000 options and 20,000 options, respectively, which were in-the-money on June 16, 1997 by at least $225,000 (Alexander), $7,500 (Kreinberg) and $30,000 (Sorin).

57.     Stock options again were purportedly granted on a company-wide basis as of January 27, 1998. A total of 3,109,473 options with an exercise price of $31.25 per share were awarded to 637 grantees. Alexander selected the January 27 date and price by looking back at CTI's trading history. The closing price of CTI's common stock on January 27 was the second-lowest closing price in the first two months of 1998. The Compensation Committee's approval for this grant was not sought or obtained on January 27, the date Alexander selected with hindsight, or at any time before the unanimous written consents were sent and signed. Indeed, the Compensation Committee did not make the grant until at least February 19, 1998, more than three weeks later, when Sorin first sent unanimous written consents to the Compensation Committee for signature. CTI's stock price closed at $45.31 on February 19, 1998. Between January 27, 1998 and February 19, 1998, the intrinsic value of each option had increased by at least $14.06 per option, or nearly $44 million across all recipients. Alexander, Kreinberg and Sorin were granted 500,000 options, 35,000 options and 50,000 options, respectively, which were in-the-money on February 19 by at least $7,030,000 (Alexander), $492,100 (Kreinberg) and $703,000 (Sorin).

58.     A fourth company-wide option grant was purportedly made as of October 9, 1998. A total of 744,000 options with an exercise price of $30 per share were awarded to 113 grantees. Yet again, Alexander (with Kreinberg's assistance this time) selected the date by looking back at CTI's trading history. On October 9, 1998, shares of CTI stock closed at the second-lowest price for the 1999 fiscal year. Compensation Committee approval for this grant was not sought or obtained on October 9, or at any time before the unanimous written consents were sent and signed. The Compensation Committee members' unanimous written consents making this grant do not indicate the date on which they were signed, but they could not have been signed earlier

20

than October 15, 1998, when Sorin sent the consents to the Compensation Committee for signature. CTI's stock price closed at $36.50 per share on October 15. Between October 9, 1998 and October 15, 1998, the intrinsic value of each option had increased by at least $6.50 per option or approximately $4.8 million across all recipients. Alexander, Kreinberg and Sorin were granted 250,000 options, 10,000 options and 7,500 options, respectively, which were in-the-money on October 15 by at least $1,625,000 (Alexander), $65,000 (Kreinberg) and $48,750 (Sorin).

59.     A fifth company-wide option grant was purportedly made as of October 18, 1999. A total of 3,834,333 options with an exercise price of $93 per share were awarded to 1,633 grantees. Alexander and Kreinberg selected the October 18 date and price by looking back at CTI's trading history – October 18 had the lowest closing price of the fiscal quarter. Compensation Committee approval for this grant was not sought or obtained on October 18, the date Alexander and Kreinberg selected with hindsight, or at any time before the unanimous written consents were sent and signed. Indeed, the Compensation Committee did not make this grant until after November 23, 1999, when Sorin sent the unanimous written consents to the Compensation Committee for signature. CTI's stock closed at $127.06 per share on November 23. Between October 18, 1999 and November 23, 1999, the intrinsic value of each option had increased by at least $34.06 per option, or $130 million across all grant recipients. Alexander, Kreinberg and Sorin were granted 315,000 options, 37,500 options and 30,000 options, respectively, which were in-the-money on November 23 by at least $10,728,900 (Alexander), $1,277,250 (Kreinberg) and $1,021,800 (Sorin). Sorin ensured that the options agreements forwarded to grant recipients referenced the backdated date – by e-mail dated April 13, 2000, the

Assistant wrote, "Per Sorin, date them the date of the grant – 10/18/99." The backdating shortened the vesting schedule of these options by more than one month.

60.     A sixth company-wide grant was purportedly made as of November 30, 2000. A total of 8,769,360 options with an exercise price of $85 per share were awarded to 3,543 grantees. November 30 was the lowest trading price of the fiscal quarter. Alexander and Kreinberg selected the date with hindsight on or about December 13, 2000. Compensation Committee approval for this grant was not sought or obtained on November 30, the date Alexander and Kreinberg selected with hindsight. In an e-mail dated December 13, 2000, from the Assistant to a human resources supervisor, the Assistant states that "I understand from David [Kreinberg] the option information has been finalized – it is November 30th at $85 per share." CTI's stock closed higher than $85 per share on November 30 and, thus, even on the backdated date, the options were already in-the-money. CTI's stock closed at $112.12 on December 13 and, therefore, when Alexander and Kreinberg made their selection, each option was even further in-the-money and remained so until at least February 22, 2001. In the interim, CTI informed at least some employees of their awards. Sorin did not send the unanimous written consents to the Compensation Committee until March 2, 2001 and by then the market had started to turn. CTI's stock closed at $76.06 on March 2, 2001.

61.     The grant approval package that accompanied the unanimous written consents on March 2, 2001, was different from the package of prior years. Kreinberg instructed the Assistant to withhold the master list from the Committee and instead to send a printout of grant recipients from Equity Edge. (That printout, further discussed in Paragraph 77, had been altered in an effort to conceal certain entries from the Compensation Committee.) Though the options were out-of-the money by $8.94 each on March 2, 2001, they were later repriced in April 2002.

Alexander, Kreinberg and Sorin received 600,000 options, 100,000 options and 40,000 options, respectively, in this grant.

62.     A seventh company-wide option grant was purportedly made as of October 22, 2001. A total of 9,446,407 options with an exercise price of $16.05 per share were awarded to 3,744 grantees. Alexander and Kreinberg selected the October 22 date and price by looking back at CTI's trading history. On October 22, 2001, shares of CTI stock traded at the second-lowest price for the 2002 fiscal year. Compensation Committee approval was not sought or obtained on October 22, the date Alexander and Kreinberg selected in hindsight, or at any time before the unanimous written consents were sent and signed. Sorin did not send unanimous written consents to the Compensation Committee to make the grant until November 28, 2001. Further, at least one Compensation Committee member did not receive a phone call from Sorin alerting him to the existence of this grant and the Company's records show he did not sign his copy of the unanimous written consent until December 18, 2001. CTI's stock closed at $21.01 on November 28, and it closed at $20.77 on December 18, 2001. Between October 22, 2001 and December 18, 2001, the intrinsic value of each option had increased by at least $4.72 per option, or nearly $45 million overall. Alexander, Kreinberg and Sorin were granted 600,000 options, 125,000 options and 27,000 options, respectively, which were in-the-money on December 18 by at least $2,832,000 (Alexander), $590,000 (Kreinberg) and $127,440 (Sorin).

63.     Accordingly, in company-wide grants alone, Alexander, Kreinberg and Sorin received 2,515,000 options, 329,777 options and 184,500 options, respectively, which were in-the-money on the date of Compensation Committee approval by more than $24 million

(Alexander), \$2.6 million (Kreinberg), \$2 million (Sorin).[1]  Only one backdated company-wide grant was not in-the-money at the time the Compensation Committee signed the consents, but, options from that grant were in-the-money for nearly three months after the "as of" date and, in any event, options received in that grant were repriced in 2002.

### 2.    CTI's Backdated "One-Off" Option Grants

64.    In addition to granting options on a company-wide basis from 1991 to 2001, CTI also granted options on an ad-hoc basis at least nineteen times.  These grants – which the Company internally referred to as "one-off" grants – oftentimes were made in order to lure a prospective employee to the Company or a subsidiary, to retain a disgruntled employee by giving him or her additional compensation in the form of options, or to give options to employees who did not receive options in previous company-wide grants.  Alexander, Kreinberg and Sorin also received generous amounts of options in the one-off grants.

65.    One-off grants were purportedly made on at least the following nineteen "as of" dates and at the following exercise prices during the period 1991 to 2001:

### One-Off Grants (1991-2001)

| "As Of" Date | Exercise Price |
|---|---|
| 2/27/91 | \$0.1875 |
| 4/03/91 | \$0.3125 |
| 7/08/91 | \$0.50 |
| 8/26/92 | \$0.781 |
| 9/15/93 | \$13.50 |
| 9/22/94 | \$10.00 |
| 2/07/95 | \$11.875 |
| 5/25/95 | \$13.50 |

---

[1]    The options and prices reflected in Paragraphs 55 through 63 are pre-split numbers – i.e., the numbers reflected in the actual grant documents.  As alleged in Paragraph 53 of the Complaint, CTI stock split on March 1, 1993, April 16, 1999 and April 4, 2000.  As a result of the splits, in today's numbers, Alexander, Kreinberg and Sorin would hold a significantly larger number of shares than are reflected in Paragraph 63 but the total value would be the same because the exercise prices, as well as the number of options, would be adjusted.

| "As Of" Date | Exercise Price |
|---|---|
| 7/19/95 | $17.1406 |
| 8/24/95 | $19.00 |
| 8/30/95 | $19.625 |
| 1/22/96 | $18.375 |
| 12/02/96 | $33.25 |
| 11/13/97 | $36.625 |
| 5/19/98 | $42.25 |
| 3/02/99 | $71.0625 |
| 5/10/00 | $65.25 |
| 8/11/00 | $76.0625 |
| 4/09/01 | $52.97 |

Alexander and Kreinberg (the latter since at least 1998), with Sorin's knowledge, followed the same look-back process for one-off grants that they used for the company-wide grants. They selected a date for the one-off grants by looking back and picking a relative low in the Company's stock price. Sorin was the liaison to the Compensation Committee for the one-off grants. As the defendants knew, or were reckless in not knowing, no corporate action to approve the grants had taken place on the "as of date" reflected in the one-off grants or at any time before the Compensation Committee formally met and voted on the grant or signed the unanimous written consents.

66.     For example, with respect to the grant dated as of April 9, 2001, which carried an exercise price of $52.97, no corporate action to approve the grant took place on April 9, 2001 or at any time before the unanimous written consents were signed. Alexander and Kreinberg selected the date a full month later on or about May 9, 2001. On May 9, Kreinberg informed Sorin and the Assistant in an e-mail that "the date [of the grant] should be [April 9] at $52.97." On May 10, 2001, when CTI's stock closed at $74 and the options were more than $20 in-the-money, the Assistant, acting at Sorin's request, sent unanimous written consents to the Compensation Committee for approval. On May 21, 2001, the Assistant informed a human

25

resources employee in Israel that the Compensation Committee had approved the grant and employees could now be informed of their awards.

67.     Also by way of example, in or about August 2000, Alexander met with a prospective employee of Infosys, then a wholly-owned subsidiary of CTI and the predecessor to Verint (the "subsidiary"), and promised him 40,000 CTI options at a price of $76.125 as an incentive to join the subsidiary.  On August 31, 2000, following up on this meeting, the CEO of the subsidiary e-mailed Kreinberg and asked the Company to honor Alexander's promise to the prospective employee.     On the same date, Kreinberg e-mailed Sorin and asked for "a remuneration [C]ommittee minute granting the 40,000 as per voicemail to you last week," and asked the Assistant to provide Sorin with the "latest date when the stock closed at [$76.125], or I believe it actually was [$]76.0625."   There was no date on which the Company's stock had closed at the prior-discussed price of $76.125.  The closest closing price was on August 11, 2000, when CTI's stock had closed at $76.0625 per share.  Sorin, Kreinberg and others received a subsequent e-mail reply from the subsidiary's CEO noting that "I am positive that Mr. [Prospective Employee] will agree to $76.0625 over $76.125 that was promised to him."

68.     Through the aforementioned process, the prospective employee ultimately received the options promised by Alexander at an exercise price of $76.0625 and with a backdated grant date of August 11, 2000.  The employee officially joined the subsidiary on Sunday, September 17, 2000.  The grant had been backdated to a date that preceded his employment with the subsidiary, which was not in accordance with the terms of any CTI stock option plan.  On September 18, the first trading day after he joined the subsidiary, the stock closed at $86.75, meaning the employee's options were in-the-money by more than $10 per share.  The Compensation Committee members' unanimous written consents making this grant

do not indicate the date on which they were signed, but the Assistant started to enter the grant into Equity Edge on October 10, 2000, when the stock closed at $91.75 per share. The employee's options were in-the-money on October 10, 2000 by more than $15 per share, or an aggregate amount of approximately $627,500.

69.     Additionally, with respect to at least one of the one-off grants – dated as of February 2, 1998 – there is no indication that it was ever approved by CTI's Compensation Committee.

70.     Alexander, Kreinberg and Sorin also received generous amounts of options in one-off grants in 1991 and/or 1994.[2]  (After 1994 they received options only in company-wide grants, which are alleged in Paragraphs 55-62.)  In the one-off grant purportedly made as of February 27, 1991, Alexander was awarded 3.36 million backdated, non-qualified options with an exercise price of $0.1875, and 890,000 backdated incentive stock options with an exercise price of $0.20625.  That same year, in the one-off grant purportedly made as of April 3, 1991, Alexander received 2.25 million, and Sorin received 250,000, backdated options with an exercise price of $0.3125.  CTI's Compensation Committee members returned to the Assistant their signed unanimous written consents approving the April 3 grant on or about August 1, 1991. Between April 3, 1991 and August 1, 1991, the options had increased in value by nearly 83%. The options received by Alexander and Sorin through the April 3, 1991 one-off grant, thus, were in-the-money by an aggregate of $562,500 and $62,500, respectively, by August 1, 1991.  In the one-off grant purportedly made as of September 22, 1994, the year Kreinberg joined CTI,

---

[2]     The options and prices reflected in Paragraphs 65 to 70 are pre-split numbers – i.e., the numbers reflected in the actual grant documents.  As alleged in Paragraph 53 of the Complaint, CTI stock split on March 1, 1993, April 16, 1999 and April 4, 2000.  As a result of the splits, in today's numbers, Alexander, Kreinberg and Sorin would hold a significantly larger number of shares than are reflected in Paragraph 70, but, the total value would be the same because the exercise prices, as well as the number of options, would be adjusted.

Alexander received 500,000, and Kreinberg received 15,000, backdated options with an exercise price of $10.   Sorin sent unanimous written consents to the Compensation Committee on November 16, 1994.  Between September 22, 1994 and November 16, 1994, the options had increased in value by nearly 28%.  Accordingly, by November 16, 1994, the options Alexander and Kreinberg received through the September 22, 1994 one-off grant were in-the-money by respective amounts of $1,375,000 and $41,250.

### 3.   Alexander, Kreinberg and Sorin's Forms 3 and 4

71.   Prior to 2002, Alexander, Kreinberg and Sorin failed to file all required Commission Forms 3 and 4 to disclose their option-related activity.  They also filed Forms 3 and 4 that contained false or misleading statements with regard to the options' expiration dates (based on backdated grant dates) and the exercise prices.

### 4.   CTI's 2002 Option Repricing

72.   CTI's stock price had fallen dramatically by 2002.  As a result, previously-granted backdated options were underwater.   In order to placate employees, in May 2002, CTI commenced a Stock Option Exchange Program ("SOEP") for all eligible employees, including executive officers.   Under the SOEP, participating employees were given the opportunity to exchange unexercised stock options previously granted to them for replacement options that would be granted on December 23, 2002 (the "Re-Grant Date").  The terms of the exchange were as follows:  replacement options were granted at a ratio of 0.85 new options for each existing option, existing options were cancelled, and the new options were assigned an exercise price equal to the fair market value of the CTI's stock on the re-grant date.  Replacement options were to vest within six months of the re-grant date if the cancelled option was vested or would vest prior to the six-month anniversary of the re-grant date.

73.     Alexander, Kreinberg and Sorin – who had exercised significant numbers of options prior to May 2002 but still held unexercised underwater options as well – each participated in the SOEP program and exchanged a portion of their backdated options for repriced options. Alexander received nearly 2 million repriced options; Kreinberg received nearly 250,000 repriced options; Sorin received more than 100,000 repriced options. By exchanging backdated options for re-priced options, Alexander, Kreinberg and Sorin were able to further lower the exercise price of their backdated options.

### E.     Expansion Of The Scheme Through The Creation Of A "Slush Fund"

74.     Alexander and Kreinberg expanded their scheme in 1999 when they created a slush fund of backdated options by issuing options from company-wide grants to fictitious employees. These fictitious employee names served as placeholders for options that Alexander and Kreinberg could, and did, give to actual employees at a later date, thus bypassing the Compensation Committee. Kreinberg falsified certain documents to hide the existence of the slush fund from the Compensation Committee and CTI's auditor.

### 1.     Alexander and Kreinberg Created a "Slush Fund" of Options by Granting Options to "Phantom" Employees

75.     In 1999, Alexander, with Kreinberg's knowledge, came up with an idea to create holding accounts for options as a way to increase his flexibility to award options to employees without going to the Compensation Committee for approval. In September 1999, Alexander and/or Kreinberg directed the Assistant to open an account in Equity Edge which the Assistant named "I.M. Fantom" (a/k/a Phantom). The name, in part, reflected the Assistant's understanding of the nature and purpose of the account, though subsequently the Assistant changed the name to "Fargo." Alexander and Kreinberg made clear to the Assistant that the Phantom/Fargo account was not to be discussed openly with anyone.

76.     As part of the company-wide grant dated as of October 18, 1999, Alexander and/or Kreinberg instructed the Assistant to create fictitious employee names and to insert those names into the master grant list that was to be sent to the Compensation Committee for approval. The Assistant made up at least 35 names and gave each one the Assistant's home address. The Assistant then entered onto the master list an option award of round amounts of approximately 5,000 options for each name. Later, after Compensation Committee approval of the grant was received, the Assistant entered into the Equity Edge "I.M. Fantom" account the total number of options that the Committee had approved for the fictitious employees.

77.     The following year, options from the company-wide grant dated as of November 30, 2000, were placed into the Phantom/Fargo account in a different manner. That year, Sorin did not send the master list of proposed grantees to the Compensation Committee. Instead, Alexander and/or Kreinberg instructed the Assistant to send the Compensation Committee a printout from Equity Edge. In this instance, the Equity Edge printout served as the grantee list and included amounts of options to be granted to each employee. The Equity Edge printout, before it was sent to the Compensation Committee, included a line entry and a proposed option amount for the Phantom/Fargo account. The Assistant, at Kreinberg's direction, removed the Phantom/Fargo line entry and option amount from the printout the Assistant provided to the Compensation Committee, but kept the number of total options reflected at the end of the printout the same. As a result, approximately 250,000 options were granted by unanimous written consent without having a grantee having been identified to the Compensation Committee on the attached printout. These approximately 250,000 options, once approved, were added to the slush fund.

30

78.     The next year, as part of the grant dated as of October 22, 2001, Alexander and/or Kreinberg again instructed the Assistant to insert fictitious names on the grant list to add options to the Phantom/Fargo account. The Assistant again invented names for fictitious employees – different names than the Assistant had previously used because the Assistant had not kept a record of the previously used names – and indicated amounts of options to be granted to the fictitious employees. At least 25 fictitious employees each received 10,000 options in this grant, option amounts that were intended not to attract attention. After the grant was approved, the Assistant again transferred the options granted to fictitious employees into the Phantom/Fargo account.

79.     Also, on several occasions, from 1999 to 2002, Alexander and/or Kreinberg caused the transfer of nearly 100,000 options, including terminated employees' unexercised options, into the Phantom/Fargo account. Such options had been awarded in earlier grants (1997 through 2001) and some were partially vested at the time they were transferred to the Phantom/Fargo account. This was contrary to the terms of CTI's shareholder-approved option plans that required unexercised options of terminated employees to be terminated and the shares returned to the pool of shares available for future option grants. Grants of options using these shares could only be made with Compensation Committee approval. The Compensation Committee was not asked to approve any of the grants made from the Phantom/Fargo account.

### 2.     Alexander and Kreinberg Use Phantom/Fargo Options

80.     Phantom/Fargo options were issued to employees under several circumstances. In all, Alexander, with Kreinberg's knowledge in certain instances, doled out approximately 175,000 options from Phantom/Fargo to real employees without the approval of the Compensation Committee.

81.    For example, in or about August 2000 and December 2000, Alexander instructed the Assistant to transfer a total of approximately 89,000 options from the Phantom/Fargo account to an Israeli executive.   These options had been added to the Phantom/Fargo account in connection with the purported October 18, 1999 grant.   The Israeli executive previously had received options amounting to a 12% share of CTI Capital, and when CTI Capital failed to go public, these options were worthless.   Alexander, in an effort to replace the worthless CTI Capital options, gave the Israeli executive Phantom/Fargo options that were in-the-money by at least $4 million.   Alexander, with Kreinberg's knowledge, instructed the Assistant to add the options to the Israeli executive's account in Equity Edge and to deduct them from the Phantom/Fargo account.   Alexander also instructed the Assistant to make these options immediately exercisable.   Kreinberg then instructed the Israeli executive in an e-mail to "[p]lease try and have [your broker] sell the shares in slowly and not in one shot, so that the market can absorb the shares slowly and not hit the stock price."   The Israeli executive quickly exercised them for at least a $4 million profit.   Alexander and/or Kreinberg also transferred 10,000 Phantom/Fargo options to various other Israeli employees, which also were made immediately exercisable.

82.    Additionally, prior to March 8, 2000, Alexander gave a CTI consultant at least 4,000 options out of Phantom/Fargo after the consultant complained about his compensation. The options had been put into the Phantom/Fargo account as part of the purported October 18, 1999 company-wide grant, and, at the time they were transferred to the consultant, nearly five months of the vesting period had passed.   On March 8, the stock closed at $221.25, meaning the employee's options were in-the-money by $128.25 per share, or an aggregate of at least $513,000.

83.     Similarly, at Alexander's direction, an attorney who subsequently joined CTI's legal department in Israel was promised 3,000 options during his interview if he joined CTI. He joined the Company on December 15, 1999 and subsequently received options from the Phantom/Fargo account. The options had been put into the Phantom/Fargo account as part of the purported October 18, 1999 company-wide grant. On December 15, the stock closed at $125.81, meaning the employee's options were in-the-money by $32.81 per share, or an aggregate of $98,430.

84.     On or about April 29, 2002, Alexander and Kreinberg closed down the Phantom/Fargo account, in response to the expected passage of the Sarbanes-Oxley Act.

### 3.     Efforts to Conceal Phantom/Fargo Options

85.     Alexander and/or Kreinberg made efforts to conceal the existence of Phantom/Fargo options from CTI's Compensation Committee (as alleged in Paragraph 77). Kreinberg also made efforts to conceal the account from CTI's auditors, D&T. In connection with the 2001 audit, D&T requested documentation related to stock option grants. The Assistant was instructed to give D&T a printout from Equity Edge, but prior to doing so, Kreinberg instructed the Assistant to remove the page relating to the Phantom/Fargo options. D&T received the Equity Edge printout that the Assistant had altered at Kreinberg's direction.

86.     In addition, on or about March 10, 2006, shortly after CTI's current GC indicated a need for a Special Committee of the Board to conduct an internal investigation into CTI's options granting practices, Kreinberg accessed Equity Edge to alter electronic records regarding the Phantom/Fargo grants. Equity Edge indicated that the Phantom/Fargo grants were cancelled on April 29, 2002 and June 20, 2002. Kreinberg, using the Assistant's password, changed the cancellation date solely to June 20, 2002, so that the Phantom/Fargo options would blend in with

millions of options that were cancelled in June 2002, as part of the Company's massive option repricing. He eventually re-inserted the April 29, 2002 date but, upon realizing that the system would show the Phantom/Fargo account had been accessed in March 2006, Kreinberg asked the Assistant to change all entries in Equity Edge so it appeared that all accounts, not just the Phantom/Fargo account, had been accessed on the same date.

### F.   CTI's Materially False And Misleading Statements And Disclosures

#### 1.   CTI's Materially False and Misleading 10-Qs and 10-Ks

87.   Alexander reviewed and signed CTI's quarterly reports on Form 10-Q for the fiscal quarters ended March 31, 1991 to October 31, 2005, and reviewed and signed CTI's annual reports on Form 10-K for fiscal years 1991 through 2005. Sorin reviewed and signed CTI's Forms 10-K, and reviewed each of CTI's quarterly reports on Form 10-Q, for the same years in his capacity as a Director. Kreinberg assisted in preparing the financial statements that appeared in CTI's Forms 10-Q and 10-K since at least 1994. Starting in June 1999, Kreinberg prepared, reviewed and signed CTI's Forms 10-Q, and he prepared, reviewed and signed CTI's Forms 10-K beginning with fiscal year 2000. The defendants knew, or were reckless in not knowing, that they made materially false and misleading statements and disclosures in the periodic filings they prepared, reviewed and/or signed.

88.   Defendants' secret option backdating scheme caused each of CTI's Forms 10-K for fiscal years 1991 through 2002, and each of CTI's Forms 10-Q during the same period, to materially understate CTI's compensation expenses and materially overstate the Company's net income and EPS because CTI failed to expense the in-the-money portion of its stock option grants during that period as required by APB 25.

89.     Additionally, from fiscal years 1996 through 2002, in its annual reports on Form 10-K, CTI made the following statements (in a footnote to its financial statements) regarding its option grants and its accounting for stock options:

> The Company applies Accounting Principles Board Opinion No. 25, "Accounting For Stock Issued to Employees," and related interpretations in accounting for its option plans. Accordingly, as all options have been granted at exercise prices equal to fair market value on the date of grant, no compensation expense has been recognized by the Company in connection with its stock-based compensation plans.

Similarly, CTI's Form 10-K for 1991 affirmatively represented that CTI had granted incentive stock options at exercise prices equal to fair market value on the date of grant. These statements were materially false and misleading in each of these years because CTI had granted stock options at prices that were below fair market value on the date of grant. Each year the corporate action necessary to formally approve stock option grants was taken after the "as of" date. As alleged previously, APB 25 required CTI to record compensation expense for options that were in-the-money on the date of grant.

90.     CTI's Forms 10-K for fiscal years 2003, 2004 and 2005 contained materially false and misleading financial statements and results because they contained, to varying degrees, materially false and misleading historical financial statements from fiscal years 1999 through 2002 due to the defendants' backdating scheme. Alexander and Kreinberg prepared, reviewed and signed, and Sorin reviewed and signed, the aforementioned Forms 10-K during this period. Alexander, Kreinberg and Sorin knew, or were reckless in not knowing, that the annual reports for fiscal years 2003 through 2005 were materially false and misleading.

91.     Alexander and Kreinberg also signed Sarbanes-Oxley Section 302 certifications falsely stating that CTI's fiscal year 2002 through 2005 Forms 10-K, and Forms 10-Q for fiscal quarters ended September 12, 2002 to December 12, 2005, did not contain any material

35

misstatements or omit material information and that the reports fairly presented in all material respects CTI's financial condition and results of operations. Both knew, or were reckless in not knowing, that these certifications were materially false and misleading. CTI's financial statements for those years did not fairly present CTI's financial condition because (i) the 2002 Form 10-K failed to account for the October 22, 2001 in-the-money grant as a compensation expense and thus, overstated net income and EPS and (ii) the 2003 through 2005 Forms 10-K included materially false and misleading financial statements from previous years that understated compensation expenses due to earlier disguised in-the-money option grants.

### 2. CTI's Materially False and Misleading Proxy Statements

92.     CTI sent shareholders a proxy statement in connection with its annual shareholder meeting and periodically for special shareholder meetings during the period 1991 through 2002. Sorin drafted and approved all of CTI's proxy statements during that period and he signed the notice to shareholders on page one of the proxies in his capacity as CTI's Corporate Secretary. Alexander prepared and/or reviewed each proxy statement between 1991 and 2002, as did Kreinberg between 1994 and 2002, prior to the statements being sent to shareholders and filed with the Commission. Defendants knew, should have known or were reckless in not knowing, that the proxies were materially false and misleading.

93.     The CTI proxy statements that were sent to shareholders annually in connection with the annual shareholders' meeting typically concerned (i) the election of directors (including the re-election of Alexander and Sorin each year), (ii) the approval and adoption of CTI's stock option plan and authorization to reserve shares for future issuance under the stock option plans and (ii) ratification of the selection of CTI's auditor. Each proxy statement sent to shareholders

during this period contained materially false and misleading disclosures or omitted material information about CTI's stock option practices.

94.     The proxy statements at issue are the following:

| Date Sorin Signed Letter to Shareholders | Date Definitive Proxy Filed with SEC | Shareholder Meeting Date | Stock Option Plan Adopted At Meeting |
|---|---|---|---|
| 10/20/94 | 10/26/94 | 12/7/94 (Annual Mtg.) | 1994 Plan |
| 10/17/95 | 10/18/95 | 11/17/95 (Annual Mtg.) | 1995 Plan |
| 11/6/96 | 11/15/96 | 12/5/96 (Annual Mtg.) | 1996 Plan |
| 12/1/97 | 12/1/97 | 1/13/98 (Annual Mtg.) | 1997 Plan |
| 8/17/99 | 9/7/99 | 10/8/99 (Annual Mtg.) | 1999 Plan |
| 8/3/00 | 5/11/01 | 9/15/00 (Annual Mtg.) | 2000 Plan |
| 5/15/01 | 5/11/01 | 6/15/01 (Annual Mtg.) | 2001 Plan |
| 1/16/02 | 1/16/02 | 2/25/02 (Special Mtg.) | 2002 Plan |

95.     Each proxy statement identified above falsely represented in the "Executive Compensation" section that options that had been granted to CTI's top executives in the prior fiscal year, including Alexander and Kreinberg, had an exercise price that was "equal to the fair market value of the underlying shares on the date of grant."

96.     Additionally, each proxy statement identified above asked shareholders to approve a stock option plan that provided, among other things, that the exercise price of incentive stock options "may not be less than 100% of the fair market value of the common stock on the date of grant." Although the proxies accurately described that particular term of the option plans that shareholders were being asked to approve, the proxies were materially false and

misleading because they failed to disclose to shareholders that this provision (identical in all of CTI's stock option plans during the relevant period) was routinely ignored by Alexander, Kreinberg and Sorin and that CTI's past and anticipated future grants were routinely in-the-money at the time of grant.

97.     Shareholders also were asked to approve stock option plans that gave the Compensation Committee "complete" or "full" authority (as all of them did) to determine the identity of option grantees and the size and terms of option grants.  Again, in asking shareholders to approve plans with that provision, the proxies correctly described the language of the plan but were materially false and misleading because they failed to inform shareholders that Alexander and Kreinberg routinely ignored this provision and allowed management to change the grant lists (including the grant recipient and the amounts to be awarded to specific recipients) <u>after</u> the Committee had approved the grant.

98.     Additionally, each proxy statement identified above asked shareholders to approve stock option plans that authorized CTI to award options only to employees of the Company and its subsidiaries and affiliates, non-employee directors and, in the case of plans pre-dating 1997, consultants.  While the proxies correctly described the plans, such proxies were materially false and misleading in that they failed to inform shareholders that (i) Alexander and Kreinberg had awarded options to persons who subsequently became employees, but, at the time of their grants, were not yet in the Company's employ and (ii) Alexander and Kreinberg caused CTI to issue options to fictitious individuals in 1999, 2000 and 2001.

99.     Alexander, Kreinberg and Sorin knew, should have known or were reckless in not knowing, that the proxy statement filed with the Commission on January 16, 2002 – relating to the February 25, 2002 special shareholders meeting – also materially misrepresented CTI's stock

38

option practices.  On February 25, 2002, shareholders were asked to (and did) approve CTI's SOEP, pursuant to which employees (including Alexander, Kreinberg and Sorin) were allowed to exchange their existing options for repriced options.   Alexander, Kreinberg and Sorin reviewed and/or prepared this proxy statement.  The proxy statement that gave notice of the February 25, 2002 meeting falsely informed shareholders that Alexander had been granted 600,000 and Kreinberg had been granted 100,000 options in the prior fiscal year with an "exercise price equal to the fair market value of the underlying shares at the date of grant."[3] Alexander and Kreinberg's options were actually in-the-money by nearly $3 million and $600,000, respectively, on the date of the grant.  CTI also falsely stated in this proxy statement that, "Options granted by the Company under the Company's stock incentive compensation plans have exercise prices not less than [sic] market price of the Company's Common Stock as reported on the NASDAQ National Market System as of the respective dates of grant."  Thus, Alexander, Kreinberg and Sorin asked shareholders to approve a repricing grant based on materially false and misleading statements in the proxy statement regarding the grants that would be repriced.

### 3.   CTI's Materially False and Misleading Registration Statements

100.   Throughout the relevant period, Alexander, Kreinberg and Sorin signed various registration statements filed with the Commission on Forms S-3 and S-4.  Alexander and Sorin signed the CTI registration statement on Form S-4 effective December 1997, and all three defendants signed the CTI registration statement on Form S-3 effective August 2003, and the CTI registration statement on Form S-4 effective June 2000.  These three registration statements incorporated by reference materially false and misleading financial statements, as well as

---

[3]      As alleged in Paragraph 62, Kreinberg had actually been awarded 125,000 options, not 100,000.

materially false and misleading disclosures, from CTI's annual reports on Form 10-K, quarterly reports on Form 10-Q and proxy statements

101.    The defendants knew, should have known or were reckless in not knowing, that they made materially false and misleading statements and disclosures in these registration statements they prepared, reviewed and/or signed.

### 4.    Defendants' Materially False and Misleading Statements to CTI's Auditors

102.    Alexander, Kreinberg and Sorin misled CTI's outside auditors in an attempt to hide their scheme. All three defendants, on multiple occasions, provided CTI's outside auditors with documentation that misrepresented the grant date of the stock option awards.

103.    Specifically, Alexander and Kreinberg signed false management representation letters that were provided to D&T in connection with annual audits. Alexander signed the letters during the entire relevant period and Kreinberg began signing in 1997, as Vice President of Finance and Treasurer, and later as CFO. Among other representations, Alexander and Kreinberg told the auditors that, "[t]here have been no irregularities involving management or employees who have significant roles in the internal control structure." Additionally, Alexander and Kreinberg represented that financial information was prepared and presented in conformity with GAAP, that there were no irregularities involving any employees that could have an effect on financial statements, that there were no violations of laws whose effects should be disclosed in financial statements, that no transactions were improperly recorded in the accounting records underlying financial statements and no material events occurred during the year that require adjustments or disclosures in the financial statements.

104.    As alleged in greater detail in Paragraph 85, in connection with D&T's audit for fiscal year 2000 or 2001, Kreinberg directed the Assistant to conceal fraudulent and improper Phantom/Fargo options by removing a page from a report provided to D&T.

105.    Sorin also prepared representation letters that were sent to D&T regarding all Compensation Committee meetings or actions taken in lieu of meetings. These letters represented that, "The Remuneration and Stock Option Committee of the Board of Directions of the Company approved the grant, as of [grant date], of options to purchase shares of the Company's Common Stock." Sorin's representations were materially false and misleading because the "as of" date indicated on the letter was not the date a corporate action legally took place nor was it the proper date of the grants. Sorin also provided the auditors with unanimous written consents containing the false grant dates.

106.    On or about March 9 and 10, 2006, Kreinberg made calls to a D&T partner then supervising an audit of CTI's fiscal year 2006 financial statements. Kreinberg notified the D&T partner of the The Wall Street Journal inquiry regarding CTI's stock option grant dates and of the formation of the Special Committee. During these conversations, Kreinberg made misrepresentations to the D&T partner about how CTI's grant dates had been selected, indicating that the former CFO had selected good dates to grant options. Kreinberg explained to the D&T partner that this meant the date had been selected when the former CFO saw a dip in the stock prices and believed there would be a subsequent rise in the market price for the stock. Kreinberg further misrepresented that the former CFO would call each member of the Compensation Committee on the very day that the former CFO had selected for the grant to obtain their approval. The paperwork would be submitted to them a short time later. Kreinberg misrepresented that he had no personal knowledge of the option grant process and to the extent

discrepancies existed, Kreinberg blamed the problems on the work habits of his predecessor. Kreinberg did not disclose the Phantom/Fargo account during these discussions.

107.    Kreinberg and Sorin placed a call to the same D&T audit partner on or about March 12, 2006. In that call, Sorin misrepresented that during the grant process Alexander, Kreinberg or one of CTI's former CFOs had called him on a date and informed him that CTI would grant options on that day. Sorin misrepresented that he spoke via telephone with each member of the Compensation Committee and got their oral consent to the grant of options on the same date that Alexander, Kreinberg or one of CTI's former CFOs had called him. Sorin also misrepresented that he dated the unanimous written consents with the date he had spoken with the Compensation Committee members over the phone

### 5.    CTI's Books and Records and Accounting Controls

108.    By virtue of Alexander, Kreinberg and Sorin's misconduct, CTI's books and records falsely and inaccurately reflected, among other things, the dates of option grants, the identity of certain persons to whom option grants were being made, the Company's stock-based compensation expenses, and the Company's financial condition. Additionally, Alexander, Kreinberg and Sorin circumvented internal accounting controls and, by virtue of their misconduct, failed to maintain a system of internal accounting controls sufficient to provide assurances that stock option grants were recorded as necessary to permit the proper preparation of financial statements in conformity with GAAP.

### ULTICOM

### A.    The Ulticom Stock Option Plan

109.    Since going public in 2000, and during the relevant period thereafter, Ulticom granted options to its employees and employee-directors (and the employees and employee-

directors of its various subsidiaries and affiliates) pursuant to two stock option plans. The 1998 Stock Incentive Compensation Plan is effective from December 21, 1998 to December 21, 2008. An amended version of the 1998 plan was made effective on January 20, 2000, and remains so until January 20, 2010. Sorin drafted Ulticom's plans, which were approved by Ulticom's board and voted upon and adopted by its shareholders.

110.    The terms of Ulticom's plans are substantially similar to the terms of CTI's 1997 and later stock option plans. The stated purpose of the plans is to attract and retain employees and directors at Ulticom and its subsidiaries and affiliates by giving those persons "a greater stake in [Ulticom's] success and a closer identity with it." The plans give Ulticom's Stock Option Committee full power to interpret and administer the plans and full authority (i) to select the specific employees to whom awards would be granted under the plans and (ii) to determine the type and amount of the award to be granted such employees, and the terms of the option agreements to be entered into with such employees. The plans prohibit the Stock Option Committee from awarding "incentive stock options" at less than the fair market value of a share of common stock on the date of grant; but there is greater latitude to award non-qualified options.

**B.    The Ulticom Bylaws**

111.    The bylaws of Ulticom, effective from March 2000 to the present, make clear that Ulticom's Stock Option Committee can formally act on option grant proposals in the same two ways that CTI's Compensation Committee can act on CTI grant proposals. The Stock Option Committee can act without a formal meeting if all members of the Committee consent in writing to the adoption of a resolution authorizing the action; or, the Stock Option Committee can act by holding a meeting at which a quorum of Committee members is present, if a majority of those

present at the meeting approve the action. Under the bylaws, any or all Committee members may participate in a Committee meeting by means of conference telephone or any other means of communication by which all participants in the meeting are able to hear each other.

112. To the extent the Stock Option Committee acted on stock option grant proposals through written consents, the signature of all members of the Stock Option Committee was required under the bylaws in order to approve a grant.

113. To the extent the Stock Option Committee acted on stock option grant proposals through a formal meeting, under the bylaws, at least two members of the Committee were required to be present at the meeting and to approve the grant. Under the bylaws, telephonic conferences with Committee members, with participation by less than a quorum, would not satisfy the requirements of a meeting.

## C.    The Option Granting Process At Ulticom

114. As described below, from at least 2000 to 2001, while he was CFO and a Director of Ulticom, Kreinberg directed and controlled Ulticom's option grant process. He, in essence, implemented the same look-back scheme that he and Alexander used at CTI. Sorin drafted the option grant document for Ulticom during the same period. Sorin knew, or was reckless in not knowing, that Ulticom's options were backdated and granted at less than fair market value on the date of the grant.

115. Unlike CTI, Ulticom did not grant stock options at set times of the year. It tried, however, to issue grants for stock options on a quarterly basis. Generally, the decision to begin the grant process was made by Ulticom executives who would contact Kreinberg to obtain his authorization to initiate a grant.

116.    After Ulticom became a public company in 2000, Kreinberg, who was then Ulticom's CFO, initiated a look-back process for selecting the dates of Ulticom option grants. Specifically, he instructed Ulticom's then Vice President of Finance and Director of Human Resources to review the stock's historical prices and to select a date, using the benefit of hindsight, when the stock was trading at a low price. Kreinberg then approved the selected date.

117.    After selection of the grant date, a master list was compiled and submitted to Kreinberg for approval. Unanimous written consents then were prepared from the template Sorin had created for CTI and a draft of the consent containing the date that had been selected using the look-back process was forwarded to Sorin for review.

118.    The unanimous written consents and grantee list were then, at the request of Kreinberg and Sorin, forwarded to Ulticom's Stock Option Committee for authorization. Committee members ultimately signed their individual copies of the consents and returned them to Ulticom where they were subsequently forwarded to Sorin for filing as corporate records. Nowhere on the unanimous written consents is there an indication of the dates on which the Committee members signed the consents.

119.    Based on their involvement in the option grant process, Kreinberg and Sorin knew, or were reckless in not knowing, that the unanimous written consents were false because the "as of" dates inserted into the consents, and later reflected in Ulticom's books and records, did not represent the date on which the Stock Option Committee approved the option grants. Kreinberg and Sorin knew that no corporate action to approve the option grants had actually occurred on the "as of" dates. Kreinberg knew this because he directed that the grant date be selected by looking back, with the benefit of hindsight, at Ulticom's historical trading. Sorin did not receive the "as of" date from Kreinberg until after that date had passed. As the liaison to the

Stock Option Committee, Sorin knew, or was reckless in not knowing, that no corporate action had taken place on the "as of" date because, among other things, the Committee had not approved the grant or signed the unanimous written consents on the "as of" date. Kreinberg and Sorin also knew, or were reckless in not knowing, that no corporate action to approve the grants occurred before the Stock Option Committee signed the unanimous written consents.

120.   By virtue of Kreinberg and Sorin's misconduct, Ulticom's books and records falsely and inaccurately reflected, among other things, the dates of option grants, the Company's stock-based compensation expenses, and the Company's financial condition.   Additionally, Kreinberg and Sorin circumvented internal accounting controls and, by virtue of their misconduct, Ulticom failed to maintain a system of internal accounting controls sufficient to provide assurances that their stock option grants were recorded as necessary to permit the proper preparation of financial statements in conformity with GAAP.   Ulticom then filed reports on Forms 10-K and Forms 10-Q containing materially false and misleading financial statements and disclosures as a result of the improper granting of, and accounting for, stock options.

**D.      Backdated Grants At Ulticom**

121.   Since going public on April 5, 2000, and throughout the period in which Kreinberg was CFO, Ulticom made three company-wide grants, all of which were backdated to correspond with dates on which Ulticom's stock had closed at historical lows during the quarter, and all of which were in-the-money at the time of Stock Option Committee approval:

| As Of Date | Exercise Price | Number of Days With Lower Closing Prices In Same Quarter, Preceding Committee Approval | Estimated Date Of Compensation Committee Approval | Price on Estimated Date Of Compensation Committee Approval | Amount In-The-Money On Estimated Date Of Approval |
|---|---|---|---|---|---|
| 7/10/00 | $22.56 | 1 | 7/20/00 | $45.25 | $22.69 / option |
| 11/28/00 | $27.48 | 0 | 12/15/00 | $39.56 | $12.08 / option |
| 3/5/01 | $19.56 | 0 | 3/14/01 | $24.50 | $4.94 / option |

122.    Kreinberg left his position as CFO of Ulticom in September 2001, but remained as one of its Directors. He continued to sign Ulticom's Forms 10-K in his capacity as a Director, including the Form 10-K for fiscal year 2002.

### E.    Materially False And Misleading Statements And Disclosures At Ulticom

#### 1.    Annual Reports

123.    During his tenure as Ulticom's CFO, Kreinberg prepared, reviewed and signed Ulticom's annual reports on Form 10-K for fiscal year 2001 and was responsible for the financial statements contained therein. Kreinberg, as an Ulticom Director, also reviewed and signed Ulticom's annual reports on Form 10-K in fiscal years 2002 through 2005. In his capacity as a Director, Sorin reviewed and signed Ulticom's annual reports on Form 10-K for fiscal years 2001 through 2004. Kreinberg and Sorin knew, or were reckless in not knowing, that each of these reports contained materially false and misleading disclosures about Ulticom's stock option practices and contained materially false and misleading financial statements because Ulticom's compensation expenses were materially understated and its net income and EPS were materially overstated.

124.   In its annual reports on Form 10-K for fiscal years 2001 and 2002, Ulticom made the following statement:

> The Company applies Accounting Principles Board Opinion No. 25, 'Accounting For Stock Issued to Employees,' and related interpretations in accounting for its option plans.   Accordingly, as all options have been granted at exercise prices equal to fair market value on the date of grant, no compensation expense has been recognized by the Company in connection with its stock-based compensation plans.

Kreinberg and Sorin knew, or were reckless in not knowing, that these statements were materially false and misleading because they had engaged in an undisclosed scheme to backdate Ulticom stock option grants in fiscal years 2001 and 2002.  Such statements were materially false and misleading in each of these years because Ulticom had granted stock options at prices that were below fair market value on the date of grant.  Each year the corporate action necessary to formally approve stock option grants was taken after the "as of" date.  As previously alleged, APB 25 required Ulticom to record compensation expense for options that were in-the-money on the date of grant.

125.   Defendants' secret option backdating scheme caused each of Ulticom's Forms 10-K for fiscal years 2001 and 2002 to materially understate Ulticom's compensation expenses and materially overstate Ulticom's net income and EPS because Ulticom failed to expense the in-the-money portion of its stock option grants during that period.

126.   Ulticom's materially false and misleading financial statements for fiscal years 2001 and 2002 were included, to varying degrees, in its Forms 10-K filed for subsequent fiscal years.  For this reason, and to the extent they included financials from earlier periods, Ulticom's annual reports on Form 10-K for fiscal years 2003, 2004 and 2005 also were materially false and misleading.  By participating in the secret backdating scheme, and by reviewing and/or signing

these subsequent annual reports, Kreinberg and Sorin knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading.

127.    Ulticom also stated in its Forms 10-K for fiscal years 2001 and 2002 that:

Options which are designated as 'incentive stock options' under the option plan may be granted with an exercise price not less than the fair market value of the underlying shares at the date of grant and are subject to certain quantity and other limitations specified in Section 422 of the Internal Revenue Code.

This disclosure was materially false and misleading because, in contravention of its option plan, Ulticom granted incentive stock options in fiscal years 2001 and 2002 with exercise prices less than the fair market value of the underlying shares at the date of grant.  By participating in the secret backdating scheme, and preparing, reviewing and/or signing these annual reports, Kreinberg and Sorin knew, or were reckless in not knowing, that these statements were materially false and misleading.

### 2.    Quarterly Reports

128.    In his capacity as Ulticom's CFO and a Director, Kreinberg also prepared, reviewed and signed four of Ulticom's quarterly reports on Form 10-Q for the fiscal quarters ended April 30, 2000 to April 30, 2001 (fiscal years 2001 and 2002).

129.    As a result of the secret backdating scheme Kreinberg and Sorin perpetrated, Ulticom materially understated its stock-based employee compensation expenses and materially overstated its net income and EPS.

130.    Ulticom's Forms 10-Q for the quarters ending July 31, 2000, October 31, 2000 and April 30, 2001 were materially false and misleading.  By participating in the backdating scheme, and preparing, reviewing and signing these quarterly reports, Kreinberg knew, or was reckless in not knowing, that these financial statements were materially false and misleading.

131.     Ulticom's materially false and misleading financial statements in its Forms 10-Q for the quarters ending July 31, 2000 and October 31, 2000 were included, to varying degrees, in Forms 10-Q that Kreinberg signed for subsequent fiscal quarters.  For this reason, Ulticom's quarterly reports on Form 10-Q for the quarters ending July 31, 2001 and October 31, 2001 also were materially false and misleading.  By participating in the secret backdating scheme, and reviewing and/or signing these subsequent quarterly reports, Kreinberg knew, or was reckless in not knowing, that these statements were materially false and misleading.

### 3.      Proxy Statements

132.     Sorin prepared and reviewed Ulticom's proxy statements from 2001 until his resignation as Ulticom's Corporate Secretary and Director in June 2004.   As a Director, Kreinberg reviewed Ulticom's proxy statements from 2001 through 2005.

133.     In its proxy statement dated July 30, 2001, Ulticom represented that the exercise price of the options granted to its executives in 2000 and 2001 was "equal to the fair market value of the underlying shares at the date of grant."  This statement was materially false and misleading because the exercise price of executive options -- like the exercise price of all employee options that had been granted during this period – was less than the closing price of Ulticom common stock on the date the grant was approved.

134.     Kreinberg and Sorin reviewed this proxy statement.  They knew, should have known or were reckless in not knowing, that this proxy statement was materially false and misleading for this reason.

### 4.      Kreinberg's and Sorin's Material Misrepresentations to Ulticom's Auditors

135.     Kreinberg and Sorin misled Ulticom's outside auditors in an attempt to hide their backdating scheme at Ulticom.

136.    In his capacity as Ulticom's CFO, Kreinberg signed false management representation letters that were dated from August 2000 to April 2001, and which were provided to D&T in connection with audits of quarterly and annual reports among other filings.  Among other misrepresentations, Kreinberg told Ulticom's auditors in these various letters that financial information was presented in conformity with GAAP, no material events occurred which would require adjustments or disclosures in the financial statements, that no fraud occurred involving either employees or management with significant roles in internal control, that there were no violations of laws whose effects should be disclosed in financial statements, that options were properly recorded or disclosed in the financial statements and that no events occurred which would cause him to believe that previous representations to D&T were no longer true.

137.    As Ulticom's Secretary, Sorin prepared, signed and sent false representation letters to D&T regarding corporate action taken by Ulticom's Stock Option Committee.  In these letters, dated February 28, 2001, and March 5, 2002, Sorin represented to D&T that Ulticom's Stock Option Committee approved option grants by unanimous written consents dated July 10, 2000, November 28, 2000, and March 5, 2001.  Sorin's representations were materially false and misleading because these purported dates of approval were not the dates when a corporate action took place, nor were they the proper dates of these option grants.

### FIRST CLAIM
### Violations of Securities Act Section 17(a)

138.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 137 above.

139.    Defendants Alexander, Kreinberg and Sorin, directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of CTI securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails,

have each:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of CTI securities.

140.   By engaging in the conduct alleged above, with respect to CTI, defendants Alexander, Kreinberg and Sorin have violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM
### Violations of Exchange Act Section 10(b)
### and Exchange Act Rule 10b-5 Thereunder

141.   The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 140 above.

142.   Defendants Alexander, Kreinberg and Sorin, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of securities.

143.   By engaging in the conduct alleged above, with respect to CTI, defendants Alexander, Kreinberg and Sorin have violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

144.   By engaging in the conduct described above, with respect to Ulticom, defendants Kreinberg and Sorin have violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
### Violations of Exchange Act Section 14(a) and Exchange Act Rule 14a-9 Thereunder

145.   The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 144 above.

146.   Defendants Alexander, Kreinberg and Sorin, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, knowingly, recklessly or negligently, solicited by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of the proxy for the same meeting or subject matter which was false or misleading.

147.   By engaging in the conduct alleged above, with respect to CTI, defendants Alexander, Kreinberg and Sorin violated Exchange Act Section 14(a) [15 U.S.C. § 78n(a)] and Exchange Act Rule 14a-9 [17 C.F.R. § 240.14a-9].

148.   By engaging in the conduct alleged above, with respect to Ulticom, defendants Kreinberg and Sorin violated Exchange Act Section 14(a) [15 U.S.C. § 78n(a)] and Exchange Act Rule 14a-9 [17 C.F.R. § 240.14a-9].

## FOURTH CLAIM
### Violations of Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1

149.   The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 148 above.

150.   Defendants Alexander, Kreinberg and Sorin knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

151.   Defendants Alexander, Kreinberg and Sorin, directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

152.   By engaging in the conduct alleged above, with respect to CTI, defendants Alexander, Kreinberg and Sorin violated Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

153.   By engaging in the conduct alleged above, with respect to Ulticom, defendants Kreinberg and Sorin violated Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM
### Violations of Exchange Act Rule 13b2-2

154.   The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 153 above.

155.   Defendants Alexander, Kreinberg and Sorin, directly or indirectly, (i) made, or caused to be made, materially false or misleading statements or (ii) omitted to state, or caused others to omit to state, material facts necessary in order to make statements made, in light of the

circumstances under which they were made, not misleading, to an accountant in connection with an audit, review or examination of financial statements or the preparation or filing of a document or report required to be filed with the Commission.

156.    By engaging in the conduct alleged above, with respect to CTI, defendants Alexander, Kreinberg and Sorin violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

157.    By engaging in the conduct alleged above, with respect to Ulticom, defendants Kreinberg and Sorin violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

### SIXTH CLAIM
### Violations of Exchange Act Rule 13a-14

158.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 157 above.

159.    Defendants Alexander and Kreinberg certified in each CTI quarterly and annual report filed between September 2002 and December 2005 that, among other things, they reviewed each of these reports and, based on their knowledge, these reports (i) did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and (ii) included financial statements and other financial information which fairly presented, in all material respects, CTI's financial condition, results of operations and cash flows.

160.    By engaging in the conduct alleged above, Alexander and Kreinberg violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

### SEVENTH CLAIM
### Violation of Exchange Act Section 16(a) and Rule 16a-3 Thereunder

161.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 160 above.

162.    Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] require officers, directors and beneficial owners of more than ten percent of any class of equity security registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] to file periodic reports disclosing any change of beneficial ownership of those securities.

163.    Defendants Alexander, Kreinberg and Sorin either failed to file with the Commission the required Forms 3 and 4 to disclose their option-related activity or filed Forms 3 and 4 that contained false or misleading statements with regard to the options' expiration dates and exercise prices.

164.    By engaging in the conduct alleged above, Alexander, Kreinberg and Sorin violated Section 16(a) of the Exchange Act[15 U.S.C. § 78p(a)] and Exchange Act Rule 16a-3 [17 C.F.R. § 240.16a-3].

### EIGHTH CLAIM
### Aiding and Abetting CTI's and Ulticom's Violations of Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1 and 13a-13 Thereunder

165.    The Commission realleges and incorporates by reference Paragraphs 1 through 164 above.

166.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1 and 13a-13 [17 C.F.R. §§ 240.13a-1 and 240.13a-13] thereunder, require issuers of registered securities to file with the Commission factually accurate annual and quarterly reports. Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-12] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made not misleading.

167.    CTI and Ulticom violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

168.    By engaging in the conduct alleged above, defendants Alexander, Kreinberg and Sorin knowingly provided substantial assistance to CTI in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

169.    By engaging in the conduct alleged above, defendants Alexander, Kreinberg and Sorin aided and abetted CTI's violations of Exchange Act Sections 13(a) Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

170.    By engaging in the conduct alleged above, defendants Kreinberg and Sorin knowingly provided substantial assistance to Ulticom in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

171.    By engaging in the conduct alleged above, defendants Kreinberg and Sorin aided and abetted Ulticom's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1] and Kreinberg aided and abetted Ulticom's violation of Exchange Act Rule 13a-13 [17 C.F.R. § 240.13a-13].

## NINTH CLAIM
### Aiding and Abetting CTI's and Ulticom's
### Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)

172.  The Commission realleges and incorporates by reference Paragraphs 1 through 171 above.

173.  Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.  Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

174.  CTI and Ulticom violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

175.  By engaging in the conduct alleged above, defendants Alexander, Kreinberg and Sorin knowingly provided substantial assistance to CTI in its violations of the aforementioned provisions, thereby aiding and abetting CTI's violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

176.  By engaging in the conduct alleged above, defendants Kreinberg and Sorin knowingly provided substantial assistance to Ulticom in its violations of the aforementioned provisions, thereby aiding and abetting Ulticom's violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully prays that this Court:

(a)   permanently enjoin defendants Alexander, Kreinberg, and Sorin from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), 14(a) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) and 78p(a)] and Exchange Act Rules 10b-5, 13b2-1, 13b2-2, 14a-9 and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2, 240.14a-9 and 240.16a-3] and from aiding and abetting violations of Section 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13];

(b)   permanently enjoin defendants Alexander and Kreinberg from violating Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14];

(c)   order defendants Alexander, Kreinberg and Sorin to disgorge, with prejudgment interest, all ill-gotten gains, compensation, and benefits (whether realized, unrealized or received) by virtue of the conduct alleged herein;

(d)   pursuant to Securities Act Section 20(a) [15 U.S.C. § 77t(a)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], order defendants Alexander, Kreinberg and Sorin to pay civil money penalties;

(e)   pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)], prohibit defendants Alexander, Kreinberg and Sorin from acting as officers or directors of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)];

(f)  pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)], prohibit defendants Alexander, Kreinberg and Sorin from acting as officers or directors of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)];

(g)  grant any equitable relief that may be appropriate or necessary for the benefit of investors pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(2)]; and

(h)  grant such other relief as the Court may deem just and appropriate.

Dated: August 8, 2006
       Washington, DC

Respectfully submitted,

_____

Suzanne J. Romajas (SR-4531)
Antonia Chion (AC-9522)
Christopher R. Conte
Noel A. Gittens
Pamela H. Kesner
Margaret Ellen
Kevin Guerrero

SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549-4030
Tel: 202-551-4473 (Romajas)
Fax: 202-772-9245 (Romajas)
E-mail: RomajasS@sec.gov

Attorneys for Plaintiff